# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARISSA LOFTIS, et al.,<br><br>　　　　　　　　Plaintiffs,<br><br>v.<br><br>RAMOS, et al.,<br><br>　　　　　　　　Defendants. | Case No. 16cv2300-MMA (MSB)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. No. 52] |

Plaintiffs Marissa Loftis ("Mrs. Loftis") and her minor child ("Junior") (collectively, "Plaintiffs") bring this civil rights action against four officials at R. J. Donovan Correctional Facility, alleging violations of their Fourth and Fourteenth Amendment rights. *See* Doc. No. 37. Defendants move for summary judgment as to all claims. *See* Doc. No. 52. Plaintiffs filed an opposition to the motion, to which Defendants replied. *See* Doc. Nos. 57, 58, 61. The Court took the motion under submission without oral argument pursuant to Civil Local Rule 7.1.d.1. *See* Doc. No. 62. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion.

# BACKGROUND[1]

This action arises out of events which occurred on April 17, 2016, at R. J. Donovan Correctional Facility ("RJD") in San Diego, California. Defendant Ramos is a correctional sergeant at RJD. On the date of the events in question, Ramos was supervising staff in the visitor processing room at the facility. According to Ramos, she received a telephone call at approximately 9:00 a.m. that morning from an anonymous individual who claimed to be a regular visitor at RJD. The individual indicated that Mrs. Loftis, "the approved visitor of Inmate Loftis, . . . was bringing narcotics into the visiting room every weekend." Ramos Decl. ¶ 2. The individual stated she had witnessed the smuggling of contraband into RJD by Mrs. Loftis and Inmate Loftis in the presence of Junior.[2] According to Ramos, the individual further "stated that Mrs. Loftis would be bringing narcotics into the visiting room again that day." *Id.* Ramos communicated the information to her supervisor, Lieutenant Wilborn. They decided that Ramos would confront Mrs. Loftis in order to determine whether she was in possession of contraband.

At approximately 11:30 a.m., Mrs. Loftis and Junior arrived at the visitor processing room to visit Inmate Loftis. Defendant Ramos approached Mrs. Loftis. The ensuing events, and the nature of the interaction between Ramos and Mrs. Loftis, are disputed by the parties. For example, Ramos states that she "asked" Mrs. Loftis if they could speak privately, and Mrs. Loftis agreed. Ramos Decl. ¶ 4. In contrast, Mrs. Loftis states that Ramos "ordered" her to "accompany her into the office and leave Junior sitting in a chair stationed outside of the office door." Loftis Decl. ¶ 16.

---

[1] These material facts are taken from Defendants' Separate Statement of Uncontested Facts, Plaintiffs' Separate Statement of Disputed and Undisputed Facts, and the parties' supporting declarations and exhibits. Where a material fact is in dispute, it will be so noted. Particular disputed material facts that are not recited in this section may be discussed *infra*. Facts that are immaterial for purposes of resolving the current motion are not included in this recitation.

[2] Plaintiffs do not dispute that Defendant Ramos received this anonymous telephone call, but Mrs. Loftis denies the truth of the individual's allegations.

Mrs. Loftis states that Defendant Valadez was also present in the office, and "took up an interior guard position in front of the door, preventing" Mrs. Loftis from exiting. *Id*. ¶ 17. Defendant Ramos states that when she asked Mrs. Loftis if she had contraband in her possession, Mrs. Loftis "hesitated" and asked "What's going to happen to my son?" Ramos Decl. ¶ 5. Mrs. Loftis denies making any such statement. Mrs. Loftis states that Ramos told her about the anonymous call, and advised Mrs. Loftis that she would have to consent to a cavity search if she wanted to visit Inmate Loftis. Mrs. Loftis claims that she denied possessing contraband, refused to consent to a strip search, and requested that she and Junior either be allowed to continue their visit or be permitted to leave. According to Mrs. Loftis, Ramos threatened her with possible incarceration and loss of parental rights over Junior. Ramos denies threatening Mrs. Loftis.

Defendant Ramos informed the on-call Investigative Services Unit Officer, Defendant Davis, of the events in question. According to Defendant Davis:

> ISU Correctional Officer [Defendant] J. Ugalde and I had been working an ongoing narcotics investigation within RJD that involved Mrs. Loftis and Inmate Loftis smuggling in narcotics into RJD. Through that investigation Officer Ugalde and I received information about Mrs. Loftis's and inmate Loftis's alleged illegal actions trafficking narcotics within RJD. For instance, we received information that inmates had purchased narcotics from Inmate Loftis numerous times, and that Mrs. Loftis brought the narcotics, as well as tobacco, into RJD every weekend during her contact visits with Inmate Loftis in the prison's visiting room.
>
> We also received information that Inmate Loftis was one of the main suppliers of narcotics and tobacco on Facility A, and that the narcotics are paid for by sending money to Mrs. Loftis in Ramona, California by Western Union money orders.

Davis Decl. ¶¶ 5-6.[3] After speaking to Ramos, Defendant Davis spoke to Mrs. Loftis via speaker phone, and advised her that he suspected her of smuggling contraband into RJD.

---

[3] Plaintiffs do not dispute that Defendants Davis and Ugalde had been conducting such an investigation, but Mrs. Loftis denies the truth of the allegations.

According to Davis, "Mrs. Loftis immediately replied 'I don't want my child to go to Child Protective Services.'" Davis Decl. ¶ 8. Mrs. Loftis denies making this statement. Davis advised Mrs. Loftis that he believed probable cause existed to obtain a telephonic search warrant from San Diego Superior Court. Davis then contacted the on-call San Diego County District Attorney to advise that he and his partner, Defendant Ugalde, would be petitioning for a telephonic search warrant to search Mrs. Loftis. Davis next contacted Ugalde, and asked him to go to RJD and start preparing the paperwork for the search warrant application. Davis arrived at RJD approximately one hour and twenty minutes after speaking to Defendant Ramos and Mrs. Loftis on the telephone.

     While Defendant Ugalde prepared the search warrant application, Defendant Davis met with Mrs. Loftis. According to Davis, he urged Mrs. Loftis to voluntarily surrender possession of any contraband on her person. Davis claims that Mrs. Loftis eventually reached into her undergarment, and appeared to be ready to pull something out. Davis states that he instructed Mrs. Loftis to stop so that he could have female officers conduct an unclothed body search. Mrs. Loftis denies that these events occurred. Thereafter, Defendant Ramos presented Mrs. Loftis with a California Department of Corrections Form 888, "Notice of Request to Search." Mrs. Loftis signed her name on the signature line next to a check-marked box indicating that she "voluntarily" agreed to be searched. Pl. Ex. 10. Mrs. Loftis does not dispute that her signature appears on the document, but claims that Defendant Ramos lied and told her it was a search warrant "authorizing the use of force" in order to conduct a court-ordered strip search. Loftis Decl. ¶ 32. Mrs. Loftis denies that she voluntarily consented to an unclothed body search. Meanwhile, Defendant Ugalde did not finish preparing the paperwork for a search warrant application because Davis advised him that Ms. Loftis had "voluntarily" consented to be searched.[4] Ugalde Decl. ¶ 8.

---

[4] Plaintiffs do not dispute that Defendants Davis and Ugalde had this conversation, but as noted, Mrs. Loftis denies voluntarily consenting to an unclothed body search.

4

Defendants Ramos and Valadez, who are both female, conducted the unclothed body search of Mrs. Loftis in a file room, with a single window that was covered during the search. Neither defendant touched Mrs. Loftis at any time during the search.

Mrs. Loftis and Junior remained separated for the duration of the events that day, which took place over the course of approximately three and a half hours. During that time, Mrs. Loftis states that she observed Junior crying, and she asked repeatedly to be reunited with him. According to Mrs. Loftis, Defendant Ramos first told her that she "no longer had custody of Junior, that [Child Protective Services] was being contacted, and that I could not speak with him." Loftis Decl. ¶ 20. Mrs. Loftis states that Ramos and Davis later claimed that "Junior had been picked up by Child Protective Services." *Id.* ¶ 31. According to Junior, he cried for "a long time" after being separated from his mother. Jr. Depo. at 19. Junior states that he asked to see his mother and the "cops" told him "no." *Id*. Defendants contend that none of the officers observed Junior crying at any time. Defendants assert that various correctional officers supervised Junior, provided him with water and toys to amuse himself, and took him outside to walk around. Defendants did not permit Mrs. Loftis and Junior to visit with Inmate Loftis that day. Ultimately, Defendant Ramos permanently prohibited Mrs. Loftis from visiting Inmate Loftis at RJD. *See* Pl. Ex. 13.

Based on these events, Plaintiffs claim that Defendants violated their Fourth Amendment rights by unlawfully detaining them for more than three hours. Mrs. Loftis claims that Defendants violated her Fourth Amendment rights by subjecting her to a warrantless and nonconsensual unclothed body search. Plaintiffs further allege that Defendants violated their Fourteenth Amendment substantive due process right to familial association. Defendants move for summary judgment on the merits of all claims. Defendants also move for summary judgment on the basis of qualified immunity.

## **LEGAL STANDARD**

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court

5

shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the outcome of the suit under applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248.

The party seeking summary judgment bears the initial burden of establishing the basis of its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party does not bear the burden of proof at trial, he may discharge his burden of showing no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate. *Id.* at 324. The party opposing summary judgment cannot "rest upon the mere allegations or denials of [its] pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir.), cert. denied, 555 U.S. 827 (2008) (internal quotation marks omitted).

"In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

## DISCUSSION

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must prove that the defendant, while acting under color of state law, deprived the plaintiff of a right or privilege conferred by the Constitution of the United States. *See Nelson v. Campbell*, 541 U.S. 637, 643 (2004) (citing 42 U.S.C. § 1983).

An official deprives a plaintiff "of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which [the plaintiff complains]." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). As such, a defendant's "liability under section 1983 is predicated on his integral participation in the alleged violation. Integral participation does not require that each officer's actions themselves rise to the level of a constitutional violation. But it does require some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007) (internal citations and quotations omitted). Because Defendants do not argue otherwise, and viewing the facts in the light most favorable to Plaintiffs, the Court considers each defendant an "integral participant" in each of the alleged constitutional violations. The Court addresses each constitutional violation in turn.

### 1. Fourth Amendment: Unreasonable Seizure

Defendants move for summary judgment as to Plaintiffs' Fourth Amendment unreasonable seizure claims. Defendants argue that in the prison visitation context, Plaintiffs' three and a half hour detention was reasonable to ensure the safety of the facility and to secure against the introduction of contraband. Defendants assert that reasonable suspicion supported Plaintiffs' detention in light of the anonymous caller's tip, Mrs. Loftis' own actions, and the corroborating information from Davis and Ugalde's investigation into Mrs. Loftis and Inmate Loftis' alleged smuggling activities. Plaintiffs contend that the information provided by the anonymous caller was insufficient to establish reasonable suspicion of criminal activity. Plaintiffs further assert that disputed material facts preclude a legal determination regarding the lawfulness of the detention in this case.

    a) <u>Relevant Law</u>

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

7

16cv2300-MMA (MSB)

searches and seizures." U.S. Const. amend. IV. To determine whether a seizure was objectively reasonable, courts look at the totality of the circumstances, "assessing, on the one hand, the degree to which [the seizure] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming v. Houghton*, 526 U.S. 295, 299–300 (1999). "It is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

In *United States v. Winsor*, 846 F.2d 1569 (9th Cir. 1988) (en banc), the Ninth Circuit outlined its two-tier approach to the Fourth Amendment. "The general rule is that seizures and searches must be supported by probable cause." *Winsor*, 846 F.2d at 1575. "A level of suspicion less than probable cause may justify a search or seizure if the intrusion on the Fourth Amendment interests is minimal, and if the minimal intrusion is outweighed by the government interests served by the police action." *Id*. The Supreme Court defined a "minimally intrusive" seizure in *Terry v. Ohio*, 392 U.S. 1 (1968), as one that occurs in public and is brief.

   b) <u>Analysis</u>

The Court's "initial task in this case is to determine the proper legal framework for evaluating the reasonableness of the seizure[s] at issue." *United States v. Guzman-Padilla*, 573 F.3d 865, 882–83 (9th Cir. 2009). There are three aspects to Plaintiffs' detention which the Court must analyze separately "because they implicate different Fourth Amendment principles:" (1) Mrs. Loftis' initial detention and questioning; (2) Mrs. Loftis' subsequent prolonged detention while Defendants sought a search warrant; and (3) Junior's detention.[5] *Sharp v. Cty. of Orange*, 871 F.3d 901, 909 (9th Cir. 2017).

---

[5] The parties do not address Mrs. Loftis' detention separately from the detention of Junior. However, as explained *infra*, Defendants did not detain Junior on suspicion of criminal activity. As such, the Fourth Amendment inquiry as to the lawfulness of Junior's detention is distinct.

8

16cv2300-MMA (MSB)

### i. Mrs. Loftis' Initial Detention

Defendant Ramos, with Defendant Valadez's assistance, initially detained Mrs. Loftis for the purpose of investigating her alleged participation in the smuggling of contraband into RJD. The reasonableness of an investigative detention depends upon "whether the [detaining] officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. Generally, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the" detention. *Florida v. Royer*, 460 U.S. 491, 500 (1983). However, "the *Terry*-stop framework is an inexact tool for use in the context of" prison visitation. *United States v. Bravo*, 295 F.3d 1002, 1012 n.8 (9th Cir. 2002) (making the same observation about the border search context).

Arguably, Defendant Ramos did not need reasonable suspicion to initially detain and briefly question Mrs. Loftis regarding the possession of contraband. As discussed further below, the majority of circuit courts have held that prison "[v]isitors can be subjected to some searches, such as a pat-down or a metal detector sweep, merely as a condition of visitation, *absent any suspicion*." *Spear v. Sowders*, 71 F.3d 626, 630 (6th Cir. 1995) (emphasis added). If minimally intrusive searches require no particularized suspicion, it logically follows that correctional officers may briefly detain visitors for limited questioning regarding the possession or smuggling of contraband into the facility.

In any event, to find that reasonable suspicion existed to justify an investigative detention, the court must examine the "totality of the circumstances" of the situation at hand, in light of the officer's own training and experience, and should uphold the detention only if it finds that "the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). An "officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an intrusion into the privacy of the

detained individual. *Terry*, 392 U.S. at 21. When considering the totality of the circumstances, courts must keep in mind that reasonable suspicion is a "commonsense, nontechnical conception[] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).

The facts available at the time of Mrs. Loftis' initial detention established reasonable suspicion to effectuate her seizure. *See United States v. Smith*, 217 F.3d 746, 749 (9th Cir. 2000) ("In order to determine if reasonable suspicion existed to justify an investigatory stop, the court must consider the facts available to the officer *at the moment of seizure*.") (emphasis added). According to Ramos' post-incident memorandum:

> On Sunday, April 17, 2016 at approximately 0900 hours I received a phone call from a Visitor who stated she wanted to remain anonymous. Visitor stated civilian Marissa Loftis-Phillips . . . , and approved visitor for Inmate M. Loftis [] was bringing in narcotics every weekend. I asked the anonymous caller how did she know. She stated she knew because they would do in front of her and her minor children. She said she was disgusted and felt that she should not have to put her children and Mrs. Loftis child through that. She further went to state they would pass the drugs in front of minor [Junior] (son of Inmate Loftis and Mrs. Loftis). The anonymous called [sic] stated Ms. Loftis would give the drugs to Inmate Loftis and then Inmate Loftis would give it to the porter to go back to A yard. The Anonymous caller stated she wanted to remain anonymous as she did not want any problems but, wanted to make clear she would not tolerate another day of Mrs. Loftis being so blatant passing drugs in front of minors to including hers.

Pl. Ex. 8 at 1-2. Citizen witnesses are presumed reliable. *See Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009). Nevertheless, courts generally uphold the lawfulness of an investigative detention "based on a[n anonymous] tip . . . only when the information possesses sufficient indicia of reliability that are independently corroborated by the police." *United States v. Thomas*, 211 F.3d 1186, 1190 (9th Cir. 2000) (citing *Florida v. J.L.*, 529 U.S. 266 (2000) (holding stop invalid where anonymous tip

"provided no predictive information and therefore left the police without means to test the informant's knowledge and credibility")).

In this case, the anonymous visitor called Defendant Ramos, the visitor processing room sergeant, directly at the prison, lending credibility to her allegations. *See, e.g.*, *Navarette v. California*, 134 S.Ct. at 1689–90 (noting that if a "call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity . . . . Given the foregoing technological and regulatory developments . . . a reasonable officer could conclude that a false tipster would think twice before using such a system."). The visitor alleged to have personally observed Mrs. Loftis and Inmate Loftis smuggling contraband into RJD "every weekend." Pl. Ex. 8 at 1. The visitor provided details regarding the alleged method of smuggling, as well as her rationale for placing the anonymous call. In sum, the anonymous call exhibited "sufficient indicia of reliability." *United States v. Edwards*, 761 F.3d 977, 984 (9th Cir. 2014).

Moreover, Defendant Ramos was acquainted with Mrs. Loftis based on her visits with Inmate Loftis at RJD. *See Ornelas*, 517 U.S. at 700 ("[A] police officer may draw inferences based on his own experience in deciding whether probable cause exists."). Ramos had observed some of these visits personally, and was aware that Mrs. Loftis and Junior frequently visited Inmate Loftis.[6] They arrived at the visitor processing room several hours later. It is well-known that the "unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country," *Block v. Rutherford*, 468 U.S. 576, 588-89 (1984), and prisons are "fraught with serious security

---

[6] As previously noted, Defendant Ramos states in her declaration in support of summary judgment that the anonymous visitor advised her that "Mrs. Loftis would be bringing narcotics into the visiting room *again that day*." Ramos Decl. ¶ 2 (emphasis added). However, this detail is not included in Defendant Ramos' incident report, which she prepared immediately following the events in question, nor is it corroborated anywhere else in the record. While not determinative with respect to the reasonable suspicion analysis, this discrepancy ultimately may be relevant to a probable cause determination.

dangers. Smuggling of money, drugs weapons, and other contraband is all too common an occurrence." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

Based on the information known to Defendant Ramos at the time, the Court finds as a matter of law that reasonable suspicion existed to briefly detain Mrs. Loftis for questioning upon her arrival that morning at RJD. *See United States v. Smith*, 217 F.3d 746, 749 (9th Cir. 2000) ("In order to determine if reasonable suspicion existed to justify an investigatory stop, the court must consider the facts available to the officer at the moment of seizure.").

### ii. Mrs. Loftis' Subsequent Prolonged Detention

The parties do not dispute that when initially questioned by Defendant Ramos, Mrs. Loftis denied possessing or smuggling contraband into RJD, and refused to consent to an unclothed body search. It is also undisputed that Defendants did not permit Mrs. Loftis to leave RJD at that point, and she remained detained for approximately three and a half hours.

An investigatory detention may become a de facto arrest requiring probable cause based on "the severity of the intrusion and the aggressiveness of the police action." *Washington v. Lambert*, 98 F.3d 1181, 1188 (9th Cir. 1996); *see also Dunaway v. New York*, 442 U.S. 200, 212 (1979) ("When the detention exceeds the boundaries of a permissible investigative stop, the detention becomes a de facto arrest requiring probable cause."). "In determining whether an official detention has ripened into an arrest, courts consider the 'totality of the circumstances.' There has been an arrest if, under the circumstances, a reasonable person would conclude that he was not free to leave after brief questioning." *United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990) (internal citations omitted). As such, "whether the police physically restrict the suspect's liberty is an important factor in analyzing the degree of intrusion." *Id*. at 1189.

Subsequent to Mrs. Loftis' refusal to consent to an unclothed body search, she was not free to leave. According to Mrs. Loftis, she was transferred to another office, the door was closed, and an officer guarded the door to prohibit her from leaving. *See* Loftis

Decl. ¶ 21. Defendant Ramos had previously taken possession of Mrs. Loftis' identification. Mrs. Loftis' car keys had been seized.[7] According to Mrs. Loftis, she was transferred to yet another office, where she communicated via speaker phone with Defendant Davis, and remained under guard for another hour and a half. These facts are undisputed. Accordingly, the Court determines as a matter of law that Mrs. Loftis was subjected to a de facto arrest.[8]

The lawfulness of the de facto arrest is an issue for the jury. "Under the Fourth Amendment, a warrantless arrest requires probable cause." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). Here, key facts material to the probable cause determination are disputed by the parties. For example, Defendants rely on their personal observations of Mrs. Loftis, including her demeanor and various statements she allegedly made during the course of the detention, to assert that the prolonged detention was reasonable. According to Defendants, Mrs. Loftis cried and expressed concern over whether Junior would be placed in the custody of Child Protective Services. *See, e.g., United States v. Mills*, 280 F.3d 915, 921 (9th Cir. 2002) (finding that defendant's suspicious remarks to the police were a factor supporting probable cause). However, Mrs. Loftis disputes those assertions in all respects.

In sum, the Court finds that it was reasonable to briefly detain Mrs. Loftis, and to question her regarding the smuggling of contraband into RJD. However, the subsequent

---

[7] The parties dispute whether Defendant Ramos forcibly seized Mrs. Loftis' purse and its contents, including her car keys, or whether Mrs. Loftis voluntarily surrendered her car keys to Defendant Davis. Regardless, it is undisputed that Mrs. Loftis no longer had the means of departing the prison in her own vehicle.

[8] Neither party moved for summary judgment as to this specific issue. However, the Ninth Circuit has held that "[d]istrict courts unquestionably possess the power to enter summary judgment *sua sponte*," *Norse v. City of Santa Cruz*, 629 F.3d 966, 971 (9th Cir. 2010), "so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex*, 477 U.S. at 326. Defendants moved for summary judgment as to the lawfulness of Mrs. Loftis' detention, therefore they were on notice that "they had to come forward with sufficient evidence to defeat" Mrs. Loftis' Fourth Amendment unreasonable seizure claim. *See Rabinovitz v. City of L.A.*, 287 F. Supp. 3d 933, 967 n.20 (C.D. Cal. 2018).

prolonged detention rose to the level of a de facto arrest. Disputed issues of material fact exist as to the reasonableness of the de facto arrest. Accordingly, the Court denies Defendant's motion for summary judgment as to Mrs. Loftis' Fourth Amendment unreasonable seizure claim.

### iii. Junior's Detention

The parties do not dispute that Junior was technically seized within the meaning of the Fourth Amendment. Nor do the parties suggest that Defendants suspected Junior of criminal activity. As such, unlike his mother, Junior was not subjected to a de facto arrest. *See, e.g.*, *Cherrington v. Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003) (noting that a minor child was not subjected to arrest even though she was contemporaneously detained with her mother who was under arrest). "[I]n cases involving seizures short of a traditional arrest, the courts should be guided by 'the ultimate standard of reasonableness embodied in the Fourth Amendment.'" *Id.* at 638 (citing *Michigan v. Summers*, 452 U.S. 692, 699–700 (1981); *Terry*, 392 U.S. at 19); *see also Matheny v. Boatright*, 970 F. Supp. 1039, 1041 (S.D. Ga. 1997) (applying reasonableness standard in case where defendant officers brought plaintiff children along as their mother was arrested on drug charges, taken to a detention facility, interrogated, and booked).

Determining the reasonableness of a seizure requires a balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing government interests at stake." *Graham v. Conner*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Here, viewing the facts in the light most favorable to Junior, a rational jury could conclude that his detention was unreasonable under the circumstances. Junior was six years-old, separated from his mother without explanation for three and a half hours, and sequestered in a room under the supervision of uniformed correctional officers. According to Plaintiffs, Junior cried and was upset. Defendant Davis states that he allowed Mrs. Loftis to call someone to come pick up Junior from RJD. However, Mrs. Loftis denies that this occurred. As such,

triable issues of fact preclude summary judgment as to Junior's Fourth Amendment claim.

### 2. Fourth Amendment: Unreasonable Search

Defendants move for summary judgment as to Mrs. Loftis' Fourth Amendment unreasonable search claim, arguing that Mrs. Loftis voluntarily consented to the unclothed search of her person. Defendants also contend that reasonable suspicion supported the search.[9] Mrs. Loftis denies that she voluntarily consented to an unclothed body search, and argues that triable issues of fact exist regarding the reasonableness of the search.

#### a) Relevant Law

The Fourth Amendment guarantees the right of citizens to be free from unreasonable governmental searches. U.S. Const. amend. IV. "[S]ubject only to a few specifically established and well-delineated exceptions," a search is presumed to be unreasonable under the Fourth Amendment if it is not supported by probable cause and conducted pursuant to a valid search warrant. *Katz v. United States*, 389 U.S. 347, 357 (1967). The majority of courts have held that the prison visitation context constitutes one of these exceptions, such that an unclothed body search of a prison visitor may be conducted based on the lesser standard of reasonable suspicion. *See, e.g.*, *O'Con v. Katavich*, No. 1:13-cv-1321-AWI-SKO, 2013 U.S. Dist. LEXIS 168387, at *15-16 (E.D. Cal. Nov. 25, 2013) ("Although not yet addressed by the Ninth Circuit in a published opinion, many other Courts of Appeals have concluded that, after weighing the state's legitimate interest in prison security against the privacy rights of prison visitors, a visitor may only be subjected to a strip search if the search is supported by reasonable

---

[9] Although at first blush Defendants appear to argue that the search was supported by probable cause, this assertion appears only in the issue statement in their memorandum of points and authorities. The substance of their argument focuses on the reasonable suspicion standard. Moreover, in their reply brief, Defendants do not contend that the probable cause existed to support the search. Defendants argue that the search was supported by reasonable suspicion.

suspicion.") (citing *Blackburn v. Snow*, 771 F.2d 556, 563 (1st Cir. 1985); *Varrone v. Bilotti*, 123 F.3d 75 (2d Cir. 1997); *United States v. Johnson*, 27 F.3d 564 (4th Cir. 1994); *Spear v. Sowders*, 71 F.3d 626, 630 (6th Cir. 1995) (en banc); *Burgess v. Lowery*, 201 F.3d 942 (7th Cir. 2000); *Thorne v. Jones*, 765 F.2d 1270, 1276-77 (5th Cir. 1985); *Boren v. Deland*, 958 F.2d 987 (10th Cir. 1992); *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir. 1982); *Kirkpatrick v. City of L.A.*, 803 F.2d 485, 488-89 (9th Cir. 1986) (in applying reasonable suspicion test, court cited strip search cases concerning prisoners, prison guards, and visitors reasoning those cases provide a "meaningful parallel" for analysis of reasonableness of strip search of officers accused of stealing from arrestee)).

        b) <u>Analysis</u>

Defendants argue that Mrs. Loftis voluntarily consented to an unclothed body search. Voluntary consent is a recognized exception to the warrant requirement. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). However, every salient fact surrounding Mrs. Loftis' purported consent is disputed by the parties. Moreover, Mrs. Loftis "alleges that prison officials detained her, that such detention was without probable cause, and that they told her she would not be permitted to depart without consenting to a search. These circumstances, if proven true, would vitiate her consent and would amount to a violation of her constitutional right to be free from being detained absent probable cause." *Spear*, 71 F.3d at 632.

Defendants argue that even if Mrs. Loftis did not consent, the search was properly supported by reasonable suspicion. As set forth above, courts have uniformly held that reasonable suspicion is the constitutional prerequisite to performing an unclothed body search of a prison visitor. The information provided by the anonymous visitor, combined with the information Defendants Davis and Ugalde had obtained during their ongoing investigation of Mrs. Loftis and Inmate Loftis, in light of Defendants' experience, training, and familiarity with the Loftis family, gave rise to a reasonable suspicion that Mrs. Loftis may have been attempting to smuggle contraband into RJD. In the prison visitation context, this is all the law requires.

In sum, the crux of the purported violation of Mrs. Loftis' Fourth Amendment rights rests not on the fact that she was ultimately searched, but rather on the fact that Defendants placed her under de facto arrest in order to do so. *See Spear*, 71 F.3d at 632 ("The clearly established rights that the defendants may have violated, taking the view of the facts most favorable to the plaintiff, are the right not to be detained without probable cause, and the right not to be searched for administrative reasons without having a chance to refuse the search and depart."). As discussed above, the reasonableness of Mrs. Loftis' prolonged detention is a question for the jury to decide. The reasonableness of the search is not. Defendants are entitled to summary judgment on Mrs. Loftis' Fourth Amendment unreasonable search claim.

### 3. Fourteenth Amendment: Familial Association

Defendants move for summary judgment as to Plaintiffs' Fourteenth Amendment familial association claims. Defendants argue that their actions on the date in question did not rise the level of a constitutional violation. Plaintiffs contend that genuine issues of material fact regarding the reasonableness of their prolonged detention and separation preclude summary judgment.

The Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. "Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013); *see also Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) ("The substantive due process right to family integrity or to familial association is well established."). However, as the Supreme Court has iterated on multiple occasions, substantive due process should not be called upon when a specific constitutional provision protects the right allegedly infringed upon. *See, e.g., United States v. Lanier*, 520 U.S. 259, 272 n. 7 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be

17

16cv2300-MMA (MSB)

analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.").

To the extent that Plaintiffs' Fourteenth Amendment claims are premised on the reasonableness of their prolonged detention, those claims fail as a matter of law. Where a plaintiff premises a Fourth Amendment claim and a substantive due process claim on the same offending conduct, the due process claim cannot go forward. *See, e.g., Graham*, 490 U.S. at 394 ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against . . . physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims . . . ."). The Fourth Amendment specifically addresses the seizures at issue in this case, and thus Plaintiffs' claims must be considered under the Fourth Amendment, not under the rubric of substantive due process.[10] Accordingly, the Court **GRANTS** Defendants' motion for summary judgment as to Plaintiffs' Fourteenth Amendment claims.

### 4. *Qualified Immunity*

Finally, Defendants claim qualified immunity from suit. Qualified immunity shields government officials from the burdens of litigation "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). A defendant is entitled to qualified immunity if, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged [do not] show the officer's conduct violated a constitutional right," or if the right violated was not clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Put another way, "at summary judgment, an officer may be denied qualified immunity in a § 1983 action only if (1) the facts alleged,

---

[10] Essentially, the claims are duplicative. This is illustrated by the fact that when an individual asserting a violation of their right to familial association also claims an unreasonable seizure, "the tests under the Fourteenth Amendment and the Fourth Amendment . . . are the same.'" *Jones v. Cty. of L.A.*, 722 F. App'x 634, 637 (9th Cir. 2018) (unpublished).

taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right; and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood his conduct to be unlawful in that situation." *Easley v. City of Riverside*, 890 F.3d 851, 856 (9th Cir. 2018). A court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As set forth above, the Court finds as a matter of law that Defendants did not violate Mrs. Loftis' Fourth Amendment rights based on the search of her person. The Court further finds that Plaintiffs' Fourteenth Amendment substantive due process claims are subject to dismissal because those claims are premised on the same facts underlying their Fourth Amendment unreasonable seizure claims. As such, the Court need not engage in an additional qualified immunity analysis with respect to these claims. *See id.*, 555 U.S. at 236 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

This leaves the question of whether Defendants are entitled to qualified immunity with respect to Plaintiffs' Fourth Amendment unreasonable seizure claims. Viewing the facts in the light most favorable to Plaintiffs, a rational jury could conclude that Defendants violated Plaintiffs' Fourth Amendment rights to not be unreasonably seized. Moving to the second step of the qualified immunity inquiry, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments," but only with respect to "open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Here, it was well-established at the time of the incident that individuals may not be subjected to a de facto arrest in the absence of probable cause. *See Green v. City & Cty. of San Francisco*, 751 F.3d 1039, 1052 (9th Cir. 2014). Reasonable correctional officers would have known that it was unlawful to detain Mrs. Loftis for three and a half

hours because she refused to consent to an unclothed body search, in the absence of probable cause. Likewise, reasonable officers would not have believed it was lawful to detain a six year-old for three and a half hours, while keeping him separated from his mother for the entire duration and in the custody of uniformed strangers. Based on the current record, Defendants are not entitled to qualified immunity with respect to Plaintiffs' Fourth Amendment unreasonable seizure claims.

## CONCLUSION

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment. The Court **DISMISSES** Plaintiffs' Fourteenth Amendment Claims and Mrs. Loftis' Fourth Amendment unreasonable search claim. Plaintiffs' Fourth Amendment unreasonable seizure claims must proceed to trial. The Court will issue a pretrial scheduling order setting all pertinent deadlines and hearings, including a trial date, forthwith. The Court **ORDERS** the parties to jointly contact the chambers of the assigned magistrate judge within three business (3) days of the date this Order is filed, for the purpose of scheduling a mandatory settlement conference at the convenience of the magistrate judge.

**IT IS SO ORDERED**.

DATE: March 5, 2019

HON. MICHAEL M. ANELLO
United States District Judge